UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALI GUTIERREZ and ASHLEY FOSTER, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br>v.<br><br>WARNER MUSIC GROUP CORP.,<br><br>  Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs Ali Gutierrez and Ashley Foster bring this Class Action Complaint against Defendant Warner Music Group Corp. ("WMG" or "Defendant"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

**NATURE OF THE ACTION**

1. WMG is one of the largest record labels in the world. It operates and maintains a number of websites from which consumers may purchase various products or music downloads. While Defendant has not issued a definitive list of these sites, one of them is www.kehlani.com, a website (with store) that advertises and sells products related to the signer Kehlani.

2. On September 2, 2020, WMG publicly announced that several of its websites had been compromised by an unauthorized third party and that information including "your name, email address, telephone number, billing address, shipping address, and payment card details (card number, CVC/CVV and expiration date)" had been accessed and potentially stolen

1

between April 25, 2020 and August 5, 2020[1] (the "Data Breach"). Shortly after that, WMG began mailing individual customers notices of the Data Breach, though it did not announce which of its websites were specifically affected.

3.   The information stolen from WMG is frequently referred to as "Sensitive Personal Information" or SPI. This SPI was then offered for sale to criminals and subsequently used to make fraudulent charges on the payment card accounts of Plaintiffs and class members. Because of Defendant's breach, customers' SPI is still available on the dark web for criminals to access and abuse. WMG's customers face a lifetime risk of identity theft.

4.   This SPI was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect customers' data.

5.   The stolen SPI has great value to hackers due to the numbers involved: It is likely that thousands of people – residents of every state – were affected by this breach.

6.   Plaintiffs bring this action on behalf of all persons whose SPI was compromised as a result of Defendant's failure to: (i) adequately protect its users' SPI, (ii) warn users of its inadequate information security practices, and (iii) effectively monitor its websites and ecommerce platform for security vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates several state consumer protection statutes.

7.   Plaintiffs and similarly situated customers ("Class Members") have suffered injury as a result of Defendant's conduct. These injuries may include: (i) lost or diminished value of SPI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the data breach, including but

---

[1]   https://oag.ca.gov/system/files/California_Consumer%20Letter.pdf, last accessed Sep. 24, 2020.

not limited to lost time; (iv) deprivation of rights they possess under the common law; (v) the continued and certainly an increased risk to their SPI, which (a) remains available on the dark web for individuals to access and abuse, and (b) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from Defendant.

9. This Court has personal jurisdiction over Defendant because it purposefully availed itself of the privilege of conducting business in the State of New York, and because it has its principal place of business in New York, New York.

10. In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendant transacts business in this District, and Defendant's principal place of business is located in this District.

## PARTIES

11. Plaintiff Ali Gutierrez is a resident of Corpus Christi, Texas. Plaintiff Gutierrez received notice of the data breach from Defendant on September 3, 2020. On May 15, 2020, Plaintiff made purchases from www.kehlani.com, a website owned by Defendant. These purchases were made by Plaintiff Gutierrez using her debit card. On or about August 3, 2020, unknown third parties withdrew approximately $3,000 from Plaintiff Gutierrez's bank account

using her debit card information. While Plaintiff Gutierrez has since been refunded the money that was withdrawn, Plaintiff Gutierrez was forced to place her apartment rent on her credit card, causing her to incur convenience fees and interest charges of approximately $300.

12. Additionally, Plaintiff Gutierrez lost time dealing with the issues related to the Data Breach. Plaintiff Gutierrez is not aware of any other relevant data breaches that could have resulted in the theft of her payment card information.

13. Plaintiff Gutierrez suffered actual injury and damages in paying money to, and purchasing products from, Defendant's website during the Data Breach, expenditures which she would not have made had Defendant disclosed that it lacked computer systems and data security practices adequate to safeguard customers' SPI from theft.

14. Plaintiff Gutierrez also suffered actual injury in the form of damages to and diminution in the value of her SPI—a form of intangible property that Plaintiff entrusted to Defendant for the purpose of purchasing or licensing Defendant's products and which was compromised in and as a result of the Data Breach.

15. Plaintiff Ashley Foster is a resident of Melrose, Massachusetts. Plaintiff Foster received notice of the data breach on or about September 3, 2020. On or about May 12, 2020, Plaintiff Foster made purchases on [www.kehlani.com](www.kehlani.com). Between July 30, 2020 and August 1, 2020, Plaintiff's credit card received approximately $2,500 in fraudulent charges from an unknown third party. While that money has subsequently been refunded to Plaintiff Foster, she has expended time and money contesting these charges with her bank. Plaintiff Foster is not aware of any other relevant data breaches which could have resulted in the theft of her payment card information.

16. Plaintiff Foster suffered actual injury and damages in paying money to, and purchasing products from, Defendant's website during the Data Breach, expenditures which she would not have made had Defendant disclosed that it lacked computer systems and data security practices adequate to safeguard customers' SPI from theft.

17. Plaintiff Foster also suffered actual injury in the form of damages to and diminution in the value of her SPI—a form of intangible property that Plaintiff entrusted to Defendant for the purpose of purchasing or licensing Defendant's products and which was compromised in and as a result of the Data Breach.

18. Defendant Warner Music Group Corp. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York, 10019.

## FACTUAL ALLEGATIONS

19. WMG is a massive international media conglomerate, predominately known as a record label. It has tens of thousands of musicians under contract, and operates websites for many of these musicians through which is directly markets and sells both music (in the form of albums, either physically or available by download) and music-related merchandise.

20. WMG is a sophisticated merchant of music and music-related merchandise, operating hundreds, if not thousands, of artist-specific websites, all of which collect SPI, including payment card information, in order to sell or license products to consumers.

21. Plaintiffs and Class Members relied on WMG to keep their SPI maintained carefully and securely, which is expected of it both through industry custom as well as its own Privacy Policy, which states, "We will use reasonable physical, technical and administrative measures to protect Personal Information under our control." Had WMG, in fact, used

reasonable measures to protect Plaintiffs' and Class Members' SPI, it would not have been stolen.

22. WMG also stated in its notification to Plaintiffs and Class Members, "We want to emphasize . . . that keeping personal information safe and secure is very important to us."[2]

23. Notably, nowhere does WMG state that it follows PCI DSS (or Payment Card Industry Data Security Standard) compliance. PCI DSS is standard throughout the payment card industry for ensuring data protection and customer security. Businesses that do not follow PCI DSS can be liable to credit card issuing banks for large fines and penalties.

24. When a customer purchases items on one of WMG's websites, as a guest or through an account, they are not asked to acknowledge a "Privacy Policy," and they are not asked to read the "Terms of Use." There is only a statement in uniform font that reads: "By placing this order, you agree to our Terms, Conditions and Cancellation Policy." Links to WMG's "Privacy Policy" and "Terms of Use" are included on the extreme bottom right borders of the website pages in unremarkable font, with no indications of hyperlinks to the policies or terms. The "Privacy Policy" and "Terms of Use," however, do not appear at all on the mobile webpage unless the user clicks on another link. Similarly, there are no links to the "Terms of Use" on the e-commerce platform where the purchase is finalized.

25. WMG sent customers, including Plaintiffs, a Notice of Data Breach which informed the recipients of the notice that:

> WHAT HAPPENED? On August 5, 2020, we learned that an unauthorized third party had compromised a number of US-based e-commerce websites WMG operates but that are hosted and supported by an external service provider. This allowed the unauthorized third party to potentially acquire a copy of the personal

---

[2] https://oag.ca.gov/system/files/California_Consumer%20Letter.pdf, last accessed September 29, 2020.

information you entered into one or more of the affected website(s) between April 25, 2020 and August 5, 2020.

WHAT INFORMATION WAS INVOLVED? Any personal information you entered into one or more of the affected website(s) between April 25, 2020 and August 5, 2020 after placing an item in your shopping cart was potentially acquired by the unauthorized third party. This could have included your name, email address, telephone number, billing address, shipping address, and payment card details (card number, CVC/CVV and expiration date).

26.     WMG admits it did not detect the Data Breach for more than three months. WMG's customers' SPI was scraped by hackers and available to other criminals and, on information and belief, may still be for sale to criminals on the dark web. Even though WMG promised consumers it uses "reasonable physical, technical and administrative measures to protect Personal Information under our control," unauthorized individuals accessed WMG's customers' SPI.

27.     In response to the Data Breach, WMG claims it "took steps to address and correct the issue. We also notified the relevant credit card providers as well as law enforcement[.]" WMG is also offering affected customers one year of "identity monitoring services," but there is no offer of identity theft insurance.

28.     WMG did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for current and former customers, causing Plaintiffs' and Class Members' SPI to be exposed.

29.     Magecart is a loose affiliation of hacker groups responsible for skimming payment card attacks on various companies, including British Airways and Ticketmaster in 2018[3] and Hanna Andersson in 2020. Typically, these hackers insert virtual credit card

---

[3]     *Magecart Hits 80 Major eCommerce Sites in Card-Skimming Bonanza*, Threatpost, Aug. 28, 2019, *available at*: https://threatpost.com/magecart-ecommerce-card-skimming-bonanza/147765/ (last accessed September 29, 2020).

7

skimmers or scrapers (also known as *formjacking*) into a web application (usually the shopping cart), and proceed to scrape credit card information to sell on the dark web.[4]

30. The hackers target what they refer to as the *fullz*; a term used by criminals to refer to stealing the full primary account number, card holder contact information, credit card number, CVC code and expiration date.

31. Magecart and these scraping breaches are not new: RiskIQ's earliest Magecart observation occurred on August 8th, 2010.[5] Thus, the Portland FBI's October 2019 warning was not the first time Defendant would have been made aware of this type of breach – it has been going on for almost a decade and the well-publicized and widespread attacks on British Airways and Ticketmaster, among many others in and before 2018, should have alerted Defendant to the imminent danger facing its customers.

32. Unfortunately, despite all of the publicly available knowledge of the continued compromises of SPI in this manner, Defendant's approach to maintaining the privacy and security of Plaintiffs' and Class members' SPI was negligent, or at the very least, Defendant did not maintain reasonable security procedures and practices appropriate to the nature of the information to protect their customers' valuable SPI.[6]

---

[4] *Id*.

[5] *Magecart: New Research Shows the State of a Growing Threat*, RiskIQ, Oct. 4, 2019, *available at*: https://www.riskiq.com/blog/external-threat-management/magecart-growing-threat/ (last accessed Jan. 30, 2020).

[6] While skimming attacks have become more popular, the practice of hackers using legitimate online services to host their infrastructure has expanded. Researchers at Malwarebytes recently discovered a rash of skimmers on the Heroku engagement platform, which is a PaaS run by Salesforce. This platform offers a free starter service for legitimate app developers to deploy, manage and scale their apps without needing to maintain their own infrastructure. Hackers are registering free accounts on Heroku to host their skimming schemes. Malwarebytes reported its findings to the Salesforce Abuse Operations team in late 2019. *There's an app for that: web skimmers found on PaaS Heroku*, Malwarebytes Labs, Dec. 4, 2019, available at:

*Value of Personally Identifiable Information*

33. The SPI of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[7] Experian reports that a stolen credit or debit card number can sell for $5-110 on the dark web; the *fullz* sold for $30 in 2017.[8] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[9]

34. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding SPI and of the foreseeable consequences that would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on its customers as a result of a breach.

35. Defendant was, or should have been, fully aware of the significant volume of daily credit and debit card transactions on its amounting to at least tens of thousands of payment card transactions, and thus, the significant number of individuals who would be harmed by a breach of Defendant's systems.

---

https://blog.malwarebytes.com/web-threats/2019/12/theres-an-app-for-that-web-skimmers-found-on-paas-heroku/ (last accessed Jan. 31, 2020).

[7] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Jan. 30, 2020).

[8] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Jan. 30, 2020).

[9] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Jan. 30, 2020).

36. There may be a time lag between when harm occurs versus when it is discovered, and also between when SPI is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[10]

37. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

38. To date, WMG has offered its customers only one year of credit monitoring service, with no identity theft insurance. The offered service is inadequate to protect Plaintiffs and Class Members from the threats they face for years to come.

39. The injuries to Plaintiffs and Class Members were directly and proximately caused by WMG's failure to implement or maintain reasonable, adequate data security measures for its customers' SPI.

## CLASS ACTION ALLEGATIONS

40. Plaintiffs bring this nationwide class action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class: **All individuals whose SPI was compromised in the data breach announced by WMG on September 2, 2020 (the "Class").**

---

[10] Report to Congressional Requesters: United States Government Accountability Office (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited September 30, 2020).

41. Excluded from the Class are the following individuals and/or entities: Defendant and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

42. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

43. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. Defendant has identified thousands of customers whose SPI may have been improperly accessed in the data breach, and the Class is apparently identifiable within Defendant's records.

44. **Commonality**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class members. These include:

   a. Whether and when Defendant actually learned of the Data Breach and whether its response was adequate;
   b. Whether Defendant owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their SPI;
   c. Whether Defendant breached that duty;
   d. Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and Class Members' SPI;
   e. Whether Defendant acted negligently in connection with the monitoring and/or

    protecting of Plaintiffs' and Class Members' SPI;

f. Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's' and Class Members' SPI secure and prevent loss or misuse of that SPI;

g. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Defendant caused Plaintiffs and Class Members damages; and

i. Whether Plaintiffs and the other Class Members are entitled to monetary and other relief.

45. **Typicality**: Plaintiffs' claims are typical of those of other Class Members because all had their SPI compromised as a result of the Data Breach due to Defendant's malfeasance.

46. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' Counsel are competent and experienced in litigating privacy-related class actions.

47. **Superiority and Manageability**: Under 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual Class Member are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

48. Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so

that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

49. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their SPI;

b. Whether Defendant breached a legal duty to Plaintiffs and the Class Members to exercise due care in collecting, storing, using, and safeguarding their SPI;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e. Whether Class Members are entitled to actual damages or injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Negligence**

50. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 49.

51. Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, using, and protecting their SPI from unauthorized third parties.

52. The legal duties owed by Defendant to Plaintiffs and Class Members include, but are not limited to the following:

   a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the SPI of Plaintiffs and Class Members in its possession;

   b. To protect SPI of Plaintiffs and Class Members in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

   c. To implement processes to quickly detect a Data Breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class members of the data breach.

53. Defendant's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the FTC, the unfair practices of failing to use reasonable measures to protect SPI by companies such as Defendant.

54. Various FTC publications and data security breach orders further form the basis of Defendant's duty.[11] Plaintiffs and Class Members are consumers under the FTC Act. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect SPI and not complying with industry standards.

---

[11] *See, e.g., Data Protection: Actions taken by Equifax and Federal Agencies in Response to the 2017 Breach*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (Aug. 30, 2019), *available at*: https://www.gao.gov/products/GAO-18-559 (regarding the Equifax data breach) (last accessed September 29, 2020).

55. Defendant breached its duties to Plaintiffs and Class Members. Defendant knew or should have known the risks of collecting and storing SPI and the importance of maintaining secure systems, especially in light of the facts that "scraping" hacks were surging in 2018 and on the rise in 2019, and in light of the FBI's October 2019 warning.

56. Defendant knew or should have known that its security practices did not adequately safeguard Plaintiff's and the other Class Members' SPI.

57. Through Defendant's acts and omissions described in this Complaint, including Defendant's failure to provide adequate security and its failure to protect the SPI of Plaintiffs and the Class from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, accessed, and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and Class Members' SPI during the period it was within Defendant's possession and control.

58. Defendant breached the duties it owes to Plaintiffs and Class Members in several ways, including:

   a. Failing to implement adequate security systems, protocols, and practices sufficient to protect customers' SPI and thereby creating a foreseeable risk of harm;
   b. Failing to comply with the minimum industry data security standards during the period of the data breach (*e.g.,* failing to adopt PCI DSS);
   c. Failing to act despite knowing or having reason to know that Defendant's systems were vulnerable to e-skimming or similar attacks; and
   d. Failing to timely and accurately disclose to customers that their SPI had been improperly acquired or accessed and was available for sale to criminals on the dark web.

59. Due to Defendant's conduct, Plaintiffs and Class Members are entitled to additional credit monitoring. The SPI taken can be used towards identity theft and other types of financial fraud against the Class Members. They got the *fullz* – everything they need to illegally use WMG's customers' payment cards to make illegal purchases. There is no question that this SPI was taken by sophisticated cybercriminals, increasing the risks to the Class Members. The consequences of identity theft are serious and long-lasting. There is a benefit to early detection and monitoring.

60. Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.[12] Annual subscriptions for credit monitoring plans range from approximately $219 to $329 per year.

61. As a result of Defendant's negligence, Plaintiffs and Class Members suffered injuries that may include: (i) the lost or diminished value of SPI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the data breach, including but not limited to time spent deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account; (iv) the continued risk to their SPI, which remains for sale on the dark web and is in Defendant's possession, subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI of customers and former customers in their continued possession; (v) future costs in terms of time, effort, and

---

[12] In the recent Equifax data breach, for example, Equifax agreed to free monitoring of victims' credit reports at all three major credit bureaus for four years, plus $1 million of identity theft insurance. For an additional six years, victims can opt for free monitoring, but it only monitors victims' credit reports at one credit bureau, Equifax. In addition, if a victim's child was a minor in May 2017, he or she is eligible for a total of 18 years of free credit monitoring under the same terms as for adults.

money that will be expended to prevent, monitor, detect, contest, and repair the impact of the SPI compromised as a result of the data breach for the remainder of the lives of Plaintiffs and Class members, including ongoing credit monitoring.

62. These injuries were reasonably foreseeable given the history of security breaches of this nature. The injury and harm that Plaintiffs and the other Class Members suffered was the direct and proximate result of Defendant's negligent conduct.

## SECOND CLAIM FOR RELIEF
### Declaratory Judgment

63. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 49.

64. Defendant owes a duty of care to Plaintiff and Class Members which would require it to adequately secure SPI.

65. Defendant still possesses SPI regarding Plaintiffs and Class Members.

66. Plaintiffs and Class Members' SPI is still for sale on the dark web.

67. Plaintiffs and Class Members are at risk of harm due to the exposure of their SPI and Defendant's failure to address the security failings that lead to such exposure.

68. There is no reason to believe that Defendant's security measures are any more adequate than they were before the breach to meet Defendant's contractual obligations and legal duties, and there is no reason to think Defendant has no other security vulnerabilities that have not yet been knowingly exploited.

69. Plaintiffs, therefore, seek a declaration that (1) Defendant's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with its explicit or implicit

contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

 a. Ordering that Defendant engages third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

 b. Ordering that Defendant engages third-party security auditors and internal personnel to run automated security monitoring;

 c. Ordering that Defendant audits, tests, and trains its security personnel regarding any new or modified procedures;

 d. Ordering that Defendant user applications be segmented by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

 e. Ordering that Defendant conducts regular database scanning and securing checks;

 f. Ordering that Defendant routinely and continually conducts internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

 g. Ordering Defendant to purchase credit monitoring services for Plaintiffs and Class members for a period of ten years; and

    h.    Ordering Defendant to meaningfully educate its users about the threats they face as a result of the loss of their SPI to third parties, as well as the steps Defendant's customers must take to protect themselves.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel;

b. For an order declaring that Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For injunctive relief as pled or as the Court may deem proper; and

h. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: September 30, 2020                          Respectfully submitted,

                                                              /s/ Kevin G. Cooper
                                                              **WOLF HALDENSTEIN ADLER**
                                                               **FREEMAN & HERZ LLP**

KEVIN G. COOPER
kcooper@whafh.com
270 Madison Avenue
New York, New York 10016
Telephone:  (212) 545-4600
Facsimile:   (212) 545-4653

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLC**
CARL MALMSTROM
malmstrom@whafh.com
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Telephone: (312) 984-0000
Facsimile:  (212) 545-4653